**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos.  18-2336, 18-2426
_____

800 RIVER ROAD OPERATING CO. LLC, dba Woodcrest Health Care Center,
Cross-Petitioner/Respondent

v.

NATIONAL LABOR RELATIONS BOARD,
Cross-Petitioner/Respondent,


_____

On Application for Enforcement and Cross-Petition for Review of an Order of the
National Labor Relations Board

NLRB-1 : 22-CA-083628
_____


Argued April 3, 2019

Before: CHAGARES, HARDIMAN, and SILER, JR.*, *Circuit Judges*


(Filed: August 6, 2019)
_____

Stephen C. Mitchell **[ARGUED]**
Fisher & Phillips
1320 Main Street
Suite 750
Columbia, SC 29201

---

* Hon. Eugene E. Siler, Jr., United States Court of Appeals for the Sixth Circuit, sitting by designation.

Jared D. Cantor **[ARGUED]**
David Habenstreit
Kira D. Vol
National Labor Relations Board
1015 Half Street, S.E.
Washington, DC 20570
     *Counsel for National Labor Relations Board*

Seth D. Kaufman
Fisher & Phillips
620 Eighth Avenue
36th Floor
New York, NY 10018

Stephen C. Mitchell, Esq. **[ARGUED]**
Fisher & Phillips
1320 Main Street
Suite 750
Columbia, SC 29201
     *Counsel for 800 River Road*


Katherine H. Hansen **[ARGUED]**
William S. Massey
Gladstein Reif & Meginniss
817 Broadway
6th Floor
New York, NY 10003
     *Counsel for 1199 SEIU United Healthcare Workers East/Intervenor Respondent*

_____

OPINION**

_____


**SILER**, *Circuit Judge*

     For the second time, we are to decide whether the National Labor Relations Board

---

     ** This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

("NLRB" or the "Board") properly found 800 River Road Operating Co. LLC—known here as "Woodcrest"—in violation of the Fair Labor Standards Act ("FLSA" or the "Act"). The first time, we said no. But this time we say yes, and we will enforce the Board's order.

## I.

About 200 employees at the Woodcrest rehabilitation and skilled nursing facility in New Milford, New Jersey set a vote to unionize for March 9. But before the election, Woodcrest made changes to the health plan. In a memorandum to employees, Woodcrest introduced lower premiums and copays retroactive to the first of the year. But the memorandum made it into the hands of only some employees. The 200 or so who planned to vote in the upcoming election were not formally notified about the new plan.

Voting employees approved unionization. Woodcrest filed objections and sought a new election. All the while, Woodcrest put the new and improved health plan into place. But it did so only for the non-voting employees. With objections still pending, Woodcrest declined to extend the benefits for voting employees.

The Union—the 1199 SEIU United Healthcare Workers East, New Jersey—filed charges against Woodcrest with the NLRB's regional director, alleging Woodcrest committed unfair labor practices in violation of § 10(b) of the Act, 29 U.S.C. § 160(b). The regional director issued a complaint claiming Woodcrest violated §§ 8(a)(1) and (a)(3) of the Act. *See* 29 U.S.C. §§ 158(a)(1), (a)(3).

3

An ALJ heard the case in 2013. Two months later, the ALJ determined Woodcrest's election process amounted to unfair labor practices in violation of the Act. After the parties filed exceptions to the ALJ's order, the Board affirmed (in relevant part), over a dissent.

A month later, Woodcrest petitioned for review of the Board's decision under § 10(f) of the Act, 29 U.S.C. § 160(f), and the Board filed a cross-petition to enforce its order. This court affirmed in part, vacated in part, and remanded the case to the Board. *800 River Road Operating Co. LLC v. NLRB*, 784 F.3d 902, 905 (3d Cir. 2015) ("*Woodcrest I*").

There, we held that the Board failed to properly analyze whether Woodcrest violated the Act. *Id.* at 909. We explained that the Board had improperly found a violation based on Woodcrest's failure to meet the so-called "safe harbor," under which the Board allows an employer to postpone benefits if it makes clear to employees that the "adjustment would occur whether or not they select a union, and that the sole purpose of the adjustment's postponement is to avoid the appearance of influencing the election['s] outcome." *Id*. at 908. The Board erred because, while the safe harbor presents one way for an employer to protect itself, an employer does not always need to meet the safe harbor. Thus, the Board "treated the § 8(a)(3) (and § 8(a)(1)) inquiry as a 'but for' test— i.e., asking only whether the employees would have received benefits but for the Union's presence—rather than considering the nature of the discrimination or the employer's purpose." *Id*. at 910. That approach was "inconsistent with what the Board was required to do, and the record was not developed regarding the issues that should have been determinative." *Id*. So we remanded to the Board to examine the claims under the proper

4

burden-shifting test in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26 (1967). *Id.* at 909-10.

On remand, the parties submitted new position statements to the Board in November 2017, and Woodcrest argued that no record evidence suggested it acted with discriminatory intent. The Union and Board General Counsel argued that under *Great Dane*, Woodcrest still violated the Act.

In its Supplemental Order issued in 2018, the Board concluded that Woodcrest's "withholding of improved healthcare benefits from employees in the stipulated unit while announcing an intent to grant those benefits to other employees was 'discriminatory conduct that could have adversely affected employee rights to some extent.'" Applying *Great Dane*, the Board then shifted the burden to Woodcrest to show that its conduct was motivated by a "substantial and legitimate business justification." Ultimately, though, the Board determined that Woodcrest "failed to establish or even assert such a justification." Thus, the Board concluded that it was "unnecessary to determine whether the record contains independent evidence of improper motivation." So, the Board found that Woodcrest violated the Act.

Woodcrest now argues that the Board again failed to properly analyze this case. In Woodcrest's view, the Board erred in its application of *Great Dane*, and this court should again remand to the Board or decline to enforce its order. Plus, Woodcrest says, the Board failed to reopen the record to take additional evidence, as this court instructed in *Woodcrest I*. The Board filed a petition for enforcement with this court, and Woodcrest filed a cross-petition for review.

II.

The Board receives broad deference since it has the "primary responsibility for developing and applying national labor policy." *800 River Road*, 784 F.3d at 906 (quoting *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990)). That does not mean the Board can do anything—its interpretation of the Act must be "rational and consistent." *Curtin Matheson*, 494 U.S. at 787. But all that is required to enforce the Board's order is "substantial evidence" supporting the application of a rational rule. *800 River Road*, 784 F.3d at 906 (quoting *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42 (1987)).

This is not an exacting review. Our inquiry is limited to whether a "reasonable mind" could say that enough evidence supported the Board's conclusion. *Id.* at 906-07. And this "reasonable mind" standard does not require one outcome or the other—it can support competing determinations. *Id.* Even if we think the Board got it wrong, reasonable minds can disagree. And so long as a reasonable mind *could* decide that substantial evidence supported the Board's conclusion, we will enforce the Board's order.

III.

An employer commits an "unfair labor practice" under § 8(a)(1) when it "interfere[s] with, restrain[s] or coerce[s] employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1). Under § 8(a)(3), an unfair labor practice occurs when an employer discriminates "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). "[A] violation of §

6

8(a)(3) normally turns on an employer's antiunion purpose or motive." *800 River Road*, 784 F.3d at 908. When a claim involves targeted benefit withholdings, we analyze § 8(a)(1) and § 8(a)(3) claims under the same framework. *NLRB v. Hudson Transit Lines, Inc.*, 429 F.2d 1223, 1227 n.8 (3d Cir. 1970). In short, to establish a violation of § 8(a)(1) or (a)(3) in targeted benefits withholding cases, the Board must find that the employer had an improper motive in doing so. *Great Dane*, 388 U.S. at 34.

In benefit withholding cases, the Board first determines whether an employer engaged in "discriminatory conduct which could have adversely affected employee rights to some extent." *800 River Road*, 784 F.3d at 909 (quoting *Great Dane*, 388 U.S. at 34). This includes two categories of behavior: (1) an employer's conduct that is "inherently destructive" of employee rights, and (2) an employer's conduct that falls short of "inherently destructive" and is "comparatively slight." *Id.* (quoting *Great Dane*, 388 U.S. at 34). In the first case, the employer's rationale is less important because "the Board can find an unfair labor practice even if the employer introduces evidence that his conduct was motivated by business considerations." *Id.* (quoting *Hudson Transit*, 429 F.3d at 1229). But in the second, the employer's justification matters because if it can "establish that [it] was motivated by legitimate objectives," then the employee must come forward with specific evidence that the employer wanted to discourage union membership. *Id.* (quoting *Hudson Transit*, 429 F.3d at 1228). If the employer fails to justify its conduct, the Board can find an unfair labor practice even "without reference to intent." *Id.* (quoting *Hudson Transit*, 429 F.3d at 1228). Only when the employer provides a substantial and legitimate business explanation does the charging party or Board have to present "specific

7

evidence of the employer's intent to discourage Union membership." *Id.* at 910 (quoting

*NLRB v. Brown*, 380 U.S. 278, 287 (2000)).

On remand, the Board first made an explicit threshold finding that Woodcrest's

actions were discriminatory and could have "adversely affected" employee rights. J.

App'x 32. So the Board shifted the burden to Woodcrest to "show that its conduct was

motivated by substantial and legitimate business objectives." *Id.* (citing *Great Dane*, 388

U.S. at 34). Although Woodcrest claimed that it withheld benefits "to maintain the status

quo and avoid impacting the election or exposing itself to unfair labor practice charges,"

the Board found that Woodcrest "offered no evidence that this was its actual motive." *Id.*

Woodcrest, the Board concluded, did not put forward any testimony about the decision to

withhold; nor did it introduce any evidence of "how when, or why the decision was

made." *Id.* Instead, the Board concluded that Woodcrest's actions sent "an unmistakable

message" that employees "were being punished for their support of the Union" and

employees were chilled from "engag[ing] in organizational activity without jeopardizing

their eligibility for benefits." *Id.* What is more, Woodcrest did not point to "any relevant

evidence that it would introduce if the record were reopened." *Id.* n.8. Thus, the Board

found it unnecessary to reopen the record. *Id.* On the Board's view, Woodcrest's

"justification" amounted to only a "bald assertion" untethered to any evidence or

testimony—and that is not enough to meet its burden. *Id.* at 32-33.

Woodcrest argues that the Board erred because although it found Woodcrest's

behavior to be discriminatory, it failed to specify whether Woodcrest's conduct was

inherently destructive or comparatively slight. And, it argues, this court previously said

8

the Board *must* make that threshold determination. Here, though, the Board found only that Woodcrest's conduct was "discriminatory conduct which could have adversely affected employee rights to some extent." J. App'x 32, 34 (quoting *Great Dane*, 388 U.S. at 34).

True, the Board did not say whether Woodcrest's conduct was either (1) inherently destructive, or (2) comparatively slight. But we note first that the Board made the explicit finding that Woodcrest discriminated in ways that affected employees. Then, the Board employed the burden-shifting approach outlined in *Woodcrest I*. J. App'x 32-33. The Board concluded that Woodcrest failed to present substantial and legitimate business justifications for its behavior and thus sided with the union. J. App'x 32. This fits with what *Great Dane* itself did. 388 U.S. at 34-35 ("it is not necessary for us to decide the degree to which the challenged conduct might have affected employee rights" because "the company came forward with no evidence of legitimate motives for its discriminatory conduct."). If the Board finds (1) discriminatory conduct that (2) the employer has no substantial and legitimate justification for, then there is no need to differentiate between whether the conduct was "inherently destructive" or comparatively slight. Even Woodcrest says so. *See* Reply Br. at 8 ("Woodcrest recognizes that *Great Dane* contemplates foregoing the determination of whether its conduct was inherently destructive in some circumstances."). If we remand to the Board, nothing in the Board's analysis would change because it already followed the burden-shifting framework this court outlined.

Woodcrest argues that the Board failed to consider Woodcrest's motive on remand. Woodcrest Br. at 23-26. It claims that the Board "ignored its burden to show improper motive by summarily concluding that Woodcrest proffered no business justification for its actions." *Id.* at 26. The Board, Woodcrest maintains, "did not shift the burden to the [Board's General Counsel] to come forward with evidence of discriminatory motive under the false finding that Woodcrest had not offered any evidence of a legitimate business justification." *Id.* at 26-27. This, Woodcrest argues "relieve[]d the GC of its burden to prove unlawful motive," and thus the Board again failed to follow *Great Dane*. *Id.* at 27.

Woodcrest misunderstands *Great Dane*. Here, the Board made a threshold determination that Woodcrest engaged in discriminatory conduct that could adversely affect employee rights. J. App'x 32; *800 River Road*, 784 F.3d at 909. As this court instructed in *Woodcrest I*, once the Board reaches this conclusion, "the burden *shifts to the employer* to 'come forward with evidence of legitimate and substantial business justifications for the conduct.'" *800 River Road*, 784 F.3d at 909 (emphasis added) (quoting *Great Dane*, 388 U.S. at 34). If the employer fails to do so, "it will be found to have violated" the Act. *Id.* The employer can avoid a violation only if it first "meets this burden," at which point the "charging party or the NLRB" must present "specific evidence of the employer's intent to discourage Union membership." *Id.* (internal quotations omitted).

Thus, at the point that the Board found Woodcrest's actions were discriminatory, the burden *shifted to Woodcrest* to justify its actions. *Id.* And because Woodcrest

10

discriminated in a way that adversely affected employee rights, the Board examined the "reason for, or purpose of, Woodcrest's different treatment." *Id.* at 910; J. App'x 32. The Board said Woodcrest put forward no legitimate reason. J. App'x 32. Instead, the Board found that Woodcrest sought to "discourage the future exercise of Section 7 rights by sending an unmistakable message to the employees" that they were punished for supporting the union. *Id.* So, all told, the Board (1) "ma[de] a finding as to the nature of the effect on employee rights," and (2) "ma[de] a finding as to the . . . reason for, or purpose of, Woodcrest's different treatment of the election-eligible employees." *800 River Road*, 784 F.3d at 910. Thus, contrary to Woodcrest's arguments, the Board applied the proper standard.

But that is not the end of the story. Given that the Board *applied* the proper test, we ask whether substantial evidence supports the result.

It does. The Board acknowledged that "no dispute" existed that Woodcrest "would have extended the benefit improvements to the employees in the stipulated unit were it not for their protected activity." J. App'x 32, 124. All agree that Woodcrest singled out employees who sought union representation. And when voting employees asked about the benefits, Woodcrest said only that "we cannot discuss the matter at this time." *Id.* at 125. The Board concluded that Woodcrest "granted the improvements to certain employees 'because they were not involved in a representation campaign,' and failed to grant the improvements to others 'specifically because they were involved in such a campaign.'" *Id.* at 32.

11

The Board's order is far from flawless.  For example, the Board contradicted itself when it found that Woodcrest failed to assert any justification and its asserted justifications were unsupported or illegitimate.  *Compare* J. App'x 25 (Woodcrest "failed to establish *or even assert* such a justification." (emphasis added)) *with* J. App'x 23-24 (describing Woodcrest's asserted justification), *and* J. App'x 120, 182 (Woodcrest's pleadings including the justification).  Had the Board stopped there its decision would lack substantial evidence and be unenforceable.

And the Board understated the evidence supporting Woodcrest's justification for treating election-eligible employees differently (*i.e.*, its good-faith effort to comply with the law and avoid unfair labor practice charges).  *See* J. App'x 32 (Woodcrest "offered *no evidence* that this was its actual motive." (emphasis added)).  Woodcrest did provide some circumstantial evidence of this justification.  *E.g.*, J. App'x 77-78 (Woodcrest distributed the memo detailing the health care plan fixes in closed envelopes to election-ineligible employees); *id.* 125 (Woodcrest implemented the fixes at three other facilities with no union-organizing activity, made no announcement of the changes to election-eligible Woodcrest employees, and declined to discuss the fixes with those who nevertheless found out about the changes during the election period); *see also S. Md. Hosp. Ctr. v. NLRB*, 801 F.2d 666, 671 (4th Cir. 1986) (employer's silence "[m]ore likely . . . evidences" good-faith effort to comply with the law).  But because Woodcrest had to prove this justification by a preponderance of the evidence, *see NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401, 403 (1983) (quoting 29 U.S.C. § 160 (c)) *abrogated on other grounds by Dir., Office of Workers' Comp. Programs, Dept. of Labor v. Greenwich*

*Collieries*, 512 U.S. 267 (1994), a reasonable person could conclude Woodcrest's scant evidence fell short.

The Board also dismissed Woodcrest's explanation for the timing of the changes to its health plan. *See* J. App'x 34 ("Nor is there *any evidence or claim* that the timing was compelled by exigency *or external factors*." (emphasis added)). Woodcrest did claim its parent company HealthBridge attempted to undo the unpopular benefit changes at all four facilities because employees were complaining and dropping coverage. *See, e.g.*, J. App'x 182 (Woodcrest position statement on remand). The parties' factual stipulations provide some support for that claim as well. *See* J. App'x 124 ¶ 4. Once again, though, a reasonable person could conclude this fell short of satisfying Woodcrest's burden.[1]

---

[1] Finally, the Board claimed that, even if the record supported Woodcrest's assertions, a good-faith effort to comply with the law can never be "a legitimate justification." J. App'x 33. That goes too far. We have found that reasonable, good-faith efforts to comply with contractual obligations can constitute legitimate business ends. *Vesuvius Crucible Co. v. NLRB*, 668 F.2d 162, 167 (3d Cir. 1981). And at least two of our sister courts have held the same for legal obligations in general. *See, e.g.*, *Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124, 1130 (9th Cir. 1978) (holding that failure to grant a wage increase could be lawfully motivated by a good-faith effort "to comply with the requirements of law"); *NLRB v. Dorn's Transp. Co.*, 405 F.2d 706, 715 (2d Cir. 1969) (noting that "a good faith effort to conform to the requirements of the law" would be a legal motivation for withholding benefits). That's because the fundamental inquiry is the employer's motive. So although mere "difficulty navigating the law" and "following faulty legal advice" may not provide sufficient justifications, *800 River Road*, 784 F.3d at 910 n.5, good-faith compliance with a reasonable interpretation of the law may suffice to show that an employer was not motivated by anti-union sentiment. *See Vesuvius*, 668 F.2d at 167. This is not to say that Woodcrest's efforts to comply with the law were, in fact, reasonable or in good faith. The Board could have found those efforts were not reasonable or not in good faith, but it could not write off that inquiry as a rule.

The Board's order is not a model of precision. But a reasonable mind, on the current record, could agree with the Board that Woodcrest failed to justify its actions. That is all that is needed to enforce the Board's order.

Finally, Woodcrest argues that the Board failed to follow *Woodcrest I* because the Board declined to reopen the record. We previously noted that "the record was not developed regarding the issues that should have been determinative." *800 River Road*, 784 F.3d at 910. The Board concluded it need not reopen the record because (1) the material facts were already stipulated or undisputed, (2) Woodcrest did not identify any new arguments or evidence it would produce if the record were reopened, and (3) the *Great Dane* framework was not a novel standard in targeted withholding cases. J. App'x 32 n.8. Indeed, Woodcrest did not even argue that it "was prevented from introducing such evidence because the case was litigated under a 'per se' theory of violation, and [Woodcrest did] not identif[y] any relevant evidence that it would introduce if the record were reopened." *Id.* at 32.

We review the Board's decision to not reopen the record for abuse of discretion. *NLRB v. Boyer Bros., Inc.*, 448 F.2d 555, 565 (3d Cir. 1971). In *Woodcrest I*, we did not order or require that the Board reopen the record. *See 800 River Road*, 784 F.3d at 910. Woodcrest points to no evidence that could come forward if the record reopened. As the Board explained, the material and relevant facts are not in dispute. J. App'x 32. Indeed, most are stipulated. *Id.* at 124-25. And on remand Woodcrest never even asked for the Board to reopen the record as the regulations instruct. *See* 29 C.F.R. § 102.48(c)(1) (A party requesting to reopen the record "must state briefly the additional evidence sought to

14

be adduced, why it was not presented previously, and that, if adduced and credited, it would require a different result."). Woodcrest did not attempt to "state . . . the additional evidence sought," or explain "why it was not presented previously," let alone show that additional evidence "would require a different result." *Id.* Of course, as Woodcrest argues, the Board *may* still reopen the record. *See* 29 C.F.R. § 102.48(b)(1). But the Board is not required to do so, and declining to reopen here does not amount to an abuse of discretion.

*    *    *

We will enforce the Board's order and deny Woodcrest's petition for review.

15